461 So.2d 375 (1984)
Walter G. HORTON, Plaintiff-Appellee,
v.
VALLEY ELECTRIC MEMBERSHIP CORPORATION, Defendant-Appellant.
No. 16705-CA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1984.
*376 Bethard & Davis by Robert E. Bethard, Coushatta, for plaintiff-appellee.
Whitehead & McCoy by C.R. Whitehead, Jr., Natchitoches, for defendant-appellant.
Before PRICE, MARVIN and NORRIS, JJ.
NORRIS, Judge.
In this personal injury suit, defendant-appellant, Valley Electric Membership Corporation, hereinafter called "VEMCO", appeals a lower court judgment in favor of plaintiff-appellee, Walter G. Horton, awarding plaintiff damages in the amount of $58,278 plus interest and court costs. Appellee answered the appeal seeking an increase in general damages. The trial court held VEMCO had breached its duty of care to plaintiff by allowing electrical transmission lines to exist in a condition that presented an unreasonable risk of harm. On appeal, VEMCO advances three assignments of error. Finding merit only in appellant's contention that the lower court abused its discretion in its general damage award, we amend the damage award and, as amended, affirm.
Defendant owns and maintains a right-of-way for electrical lines through certain property in Red River Parish owned by Roby Jones and leased to Billy Don Morgan. VEMCO had placed a 7,620 volt power *377 line on the right-of-way to service a hunting camp located on the property. The hunting camp is located at least ¼ of a mile from the site where plaintiff's accident occurred.
On November 18, 1982, plaintiff was preparing for a deerhunt. He went to the camp located on the subject property, retrieved an eight foot metal deerstand that resembled a ladder, and placed it on top of his jeep. It was stipulated that plaintiff was lawfully on the premises. Plaintiff then drove to the top of a hill and parked on or near VEMCO's right-of-way, which runs alongside a wooded area, with the intention of setting up the stand. Plaintiff testified he remembered lifting the deerstand off the top of the jeep, placing it in an upright position on his shoulder and taking one or two steps backward. The next thing plaintiff remembered was waking up on the ground on his back. He was paralyzed but could see electrical wires above his head. Plaintiff opined he had been "shocked" when the deerstand came into contact with the electrical wires. Plaintiff testified he was afraid because he could not move and thought his limbs had been blown off and he was going to die. However, within a few minutes, the paralysis subsided and he was able to get up and drive himself to his mother's house. Plaintiff immediately contacted his family physician, Dr. Wyche Coleman, who hospitalized him. As a result of being shocked, plaintiff suffered a third degree burn on his left foot, a first degree burn on his right shoulder and a first degree subcutaneous burn on his right hand and other complications.
The VEMCO electrical service line on the right-of-way where the accident occurred consists of two wires. The high wire, or primary line, is, according to defendant's safety director, an energized uninsulated electrical line carrying 7,260 volts. The lower line, or neutral wire, according to the safety director, has a potential of zero and would not cause a shock unless one cut it and held both ends.
Plaintiff and a friend, Michael Simpson, measured the lines after the accident on two occasions. On the first, shortly after the accident according to the photographs, they testified the lines were low and estimated the lower line to be nine and one-half to ten feet above the ground. On the second occasion, in May of 1983, they actually measured the lines and Simpson testified the lines were even lower and that the lowest line was only seven feet four inches off the ground.
In June of 1983, VEMCO's safety director, Leo Friday, after learning of the accident, visited the site, measured the lines, and found them to be in his words, "extremely low." He found the primary wire to be thirteen feet eight inches above the ground and the neutral line to be seven feet six inches above the ground.
Friday did not deny that plaintiff had been shocked but could not explain how the accident occurred. Friday examined the primary wire, which was introduced into evidence, and could find no evidence that it caused the injury but admitted that the accident could have happened without causing a burned area on the wire.
Friday further testified that although VEMCO's lines were constructed to comply with the National Electric Safety Code, VEMCO did not conduct regular inspections to assure that their lines were maintained in compliance therewith. He admitted there had been no actual inspection of the lines in question at any time prior to the accident.
In answers to interrogatories, defendant stated that under the National Electric Safety Code, an uninsulated electrical line in a rural area carrying 7,620 volts should be constructed and maintained at a minimum height of fifteen feet above the ground.[1]
*378 Plaintiff testified that at the time of the accident, the top of the deerstand, introduced into evidence, reached a height of either nine feet four inches or ten feet four inches above the ground, depending upon which rung was resting on his shoulder at the time he backed away from the jeep. Plaintiff could not be sure exactly which rung rested on his shoulder at the time. He also stated that while he was generally aware there were power lines in the area, he had not specifically noticed any power lines at the accident site prior to the accident. There were no buildings near the site.
We note that plaintiff's version of the accident is uncontradicted and the medical evidence corroborates that his injuries resulted from an electrical shock.
After trial, the lower court concluded that plaintiff had received an electrical shock which was caused solely by the negligence of VEMCO in allowing its electrical lines to exist in an unreasonably dangerous condition. It concluded that VEMCO's failure to maintain its electrical lines at a safe height was a breach of its duty of care to protect the plaintiff and others similarly situated from the particularly dangerous condition of low hanging electrical wires. The trial court awarded plaintiff special damages in the amount of $3,278 for medical expenses and $55,000 for general damages. The general damage award included an amount necessary to pay for additional corrective foot surgery.
VEMCO suspensively appealed contending the trial court erred in finding it negligent; in failing to apply the doctrine of comparative negligence; and in abusing its discretion by awarding excessive general damages.

ASSIGNMENTS OF ERROR NOS. 1 & 2
Here, appellant alleges that the lower court erred in its finding that VEMCO was negligent in allowing electrical lines to exist at a low height, creating an unreasonably dangerous condition, and, in the alternative, if VEMCO is at fault, in not applying the doctrine of comparative negligence.
In Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983) and Kent v. Gulf States Utilities Co., 418 So.2d 493 (La. 1982), the Louisiana Supreme Court recently considered the principles of tort liability which apply when injury occurs as the result of contact with overhead power lines. The court rejected the suggestion that absolute liability be imposed upon a utility company. In both Kent and Hebert, because the utility company had actual knowledge of the condition of its lines, the court found it unnecessary to impose strict liability. Rather, it applied the principles of negligence and assessed the liability of the various parties to the accident under a duty-risk analysis.
Despite the holding in favor of the utility in Kent because of the peculiar and unusual facts of that case, the court stated in Hebert that it did not intend to diminish in any way the high degree of care that Louisiana courts have required of those who deal in the manufacture and distribution of electricity.
Electric transmission companies which maintain and employ high power lines are required to exercise the utmost care to reduce hazards to life as far as practicable. Hebert v. Gulf States Utilities Co., supra; Simon v. Southwest La. Elec. Membership, 390 So.2d 1265 (La. 1980). However, an electric utility is not required to guard against situations which cannot reasonably be expected or contemplated. Simon, supra.
The three-fold duty of a utility in cases where injury is easily associated with the transmission of electricity over high power lines, as set forth in Simon, supra, is (1) to insulate the lines, or (2) to warn adequately of the danger, or (3) to take other proper and reasonable precaution to prevent injury. Mere compliance with safety standards does not, per se, relieve the utility of negligence. Simon, supra; McKowen v. Gulf States Utilities Co., 358 So.2d 675 (La.App. 1st Cir.1978). In order *379 for a violation or breach of duty to constitute negligence, it must be shown that the utility had knowledge, actual or constructive, of the danger and that it failed to correct same or warn of the danger. McCoy v. Franklin Parish Police Jury, 414 So.2d 1369 (La.App. 2d Cir.1982).
Had the lines met the height requirement of the National Electric Safety Code, the accident would not have occurred. As in Kent, supra, VEMCO would have effectively "insulated" its lines by "isolation." However, in the instant case, VEMCO's lines were found by the trial court to have been hanging dangerously low at the time of plaintiff's accident, and thus, to have created an unreasonable risk of harm to plaintiff. That finding is amply supported by the evidence and is not manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The record shows that both plaintiff and defendant measured the height of the lines subsequent to the accident. Regardless of which measurement is used, the evidence preponderates that at the time of plaintiff's accident, an electrical wire, capable of "shocking," was hanging as low as ten to eleven feet above the ground, which is much lower than the National Electric Safety Code requirement.[2]
Appellant, in an effort to absolve itself of negligence, argues that its lines were constructed in compliance with the National Electric Safety Code and in such a manner that they should have remained in compliance therewith, absent some intervening force. In essence, appellant's argument is that it had no actual knowledge of its low hanging electrical wires. However, VEMCO admitted that it had no reliable regular inspection system for ascertaining whether its electrical lines were in need of maintenance or repair and further admitted the subject line had never been inspected since construction to insure its continued compliance with the safety code requirements. In light of this admission coupled with the high degree of care required by our courts of those who deal in the manufacture and distribution of electricity, we conclude that VEMCO is charged with constructive notice of its dangerously low hanging lines. Compare, McCoy v. Franklin Parish Police Jury, supra. The trial court correctly concluded that VEMCO breached its duty to plaintiff to protect him from the risk of electrocution. VEMCO, by failing to have a systematic schedule of inspection, did not take proper and reasonable precautions to prevent injury to persons like plaintiff. See, Simon v. Southwest La. Elec. Membership, supra. In sum, VEMCO failed to exercise the utmost care to reduce hazards to life as far as practicable. The trial court's conclusion that VEMCO was negligent in this case was correct.
VEMCO further contends that the lower court erred in failing to find plaintiff comparatively or contributorily negligent. It argues that despite the fact its lines were dangerously low, the wires themselves were adequate warning that they carried electricity and could cause injury if a grounded object came in contact with them. We find VEMCO's argument unconvincing.
The relevant question is: did plaintiff's conduct conform to the standard of care that would be exercised by a reasonable man? In other words, did the plaintiff, Horton, breach a duty to himself by failing to avoid the unreasonable risk created by the defendant utility company? Dyson v. Gulf Modular Corporation, 338 So.2d 1385 (La.1976). We agree with the lower *380 court's conclusion that plaintiff did not in the instant case.
The party relying on contributory negligence has the burden of proving it. Failure to take every precaution against every foreseeable risk or to use extraordinary skill, caution, and foresight does not constitute negligence or contributory negligence. The victim is only required to use reasonable precautions and his conduct in this regard is not negligent if, by a common sense test, it is in accord with that of reasonably prudent persons faced with similar conditions and circumstances. Dupas v. City of New Orleans, 354 So.2d 1311 (La.1978); Smolinski v. Taulli, 276 So.2d 286 (La.1973).
The fact that a person's own actions bring him in contact with high voltage wires does not necessarily make him negligent. Hebert v. Gulf States Utilities, supra.
While plaintiff was generally aware of the electric line right-of-way, he certainly was not specifically aware of nor should he have expected the immediate danger presented by the unusually low hanging electrical wires. The plaintiff could reasonably expect the utility to maintain its lines at a safe height well above where they were on the date of this accident. Plaintiff was in a wooded area with no buildings nearby and could reasonably expect he could lift a portable deerstand to a maximum height of ten feet four inches off the ground without coming in contact with high voltage electrical lines. The lower court's conclusion that plaintiff's conduct conformed to the standard of care that would be exercised by a reasonable man under similar circumstances was not erroneous.
We further conclude that VEMCO is also strictly liable for the defective electrical wires under La.C.C. Art. 2317. Here, as opposed to Kent and Hebert, the defective thing that posed the unreasonable risk of harm was not uninsulated wires the location and height of which were known to the utility. The defective thing in the instant case was VEMCO's uninsulated wires that were hanging dangerously low to the ground, a condition which was actually unknown to VEMCO. These wires were in an area extensively used for hunting.
In Kent v. Gulf States Utilities Co., supra, the court stated at page 497:
Accordingly, in a strict liability case in which the claimant asserts that the owner's damage causing thing presented an unreasonable risk of harm, the standard for determining liability is to presume the owner's knowledge of the risk presented by the thing under his control and then to determine the reasonableness (according to traditional notions of blameworthiness) of the owner's conduct in light of that personal knowledge.
... Under strict liability concepts, the owner was presumed to have knowledge of the [hazardous] condition, and ... was liable because a reasonable owner who had discovered the hazardous condition would not have maintained the thing as he did without correcting or minimizing the risk ...
Here, had VEMCO discovered the low hanging wires, its only reasonable conduct would have been to correct or warn against the unreasonable risk of harm. Thus, under the strict liability concept of 2317, VEMCO is liable for its "fault" in maintaining defective electrical lines and not preventing the "thing" from causing injury, unless it proved that the damage was caused by the fault of the victim, by the fault of a third person, or by an irrestible force. VEMCO failed to prove victim fault, third party fault or that the damage was caused by an irrestible force.

ASSIGNMENT OF ERROR NO. 3
Defendant claims that the award of the trial court of $55,000 in general damages was excessive. After a careful review of the record, we agree.
In Coco v. Winston, 341 So.2d 332 (La. 1976), the court stated:
... [B]efore a court of appeal can disturb an award made by a trial court ... *381 the record must clearly reveal that the trier of fact abused its discretion in making its award. [Citations omitted.] Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. [Citation omitted.]
Since the finder of fact does have much discretion in fixing damages, the appropriate procedure for testing whether the trial judge abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trial court. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977).
In Reck v. Stevens, 373 So.2d 498 (La. 1979), the court further amplified their earlier holding:
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to this case and this individual may a reviewing court determine that the award is excessive.
* * * * * *
Thus the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much discretion," La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reasons, be considered either excessive, [citations omitted] or insufficient [citation omitted]. [Footnote omitted.]
We recognize that electrical shock can be a very traumatic injury. Unlike an ordinary thermal burn which usually only affects one area, electrical shock can cause damage to the entire body.
The injuries suffered by the plaintiff were a first degree burn on his hand, a first degree burn on his shoulder and a third degree burn on his left foot. Plaintiff was hospitalized on two occasions for a total of five days. The first degree burn on his shoulder only required treatments of local cream and the burn on his hand essentially required no treatment. He underwent a debridement of his left foot and a skin graft procedure which should have healed within ten to twelve weeks. He wore an UNA boot after the skin graft procedure for a short period to protect the area. He was on crutches for three to four weeks. Immediately after he was shocked, there was evidence of internal injury to plaintiff's skeletal musculature system as was evidenced by elevated levels of certain enzymes. The doctors testified there is no evidence of permanent internal injury to plaintiff, however, that possibility remains. Further, plaintiff has some increased risk of skin cancer at the graft site and the medical testimony admits that cataracts and arthritic complications are speculative possibilities but not probabilities.
Plaintiff has a small scar on his left shoulder. The donor site for the skin graft presents a small discolored area which should disappear in one to three years. Plaintiff's left foot has a 1.2 by 1.9 centimeter permanent disfiguring scar and was still painful at time of trial. Because of this pain, this 25 year old plaintiff testified he could not participate in extensive athletic endeavors as he once did. The best medical testimony indicates that another surgical operation will relieve this problem, at a cost of not more than $1,500. For a short period, plaintiff thought he was sterile as a result of this accident. However, that proved to be false. Plaintiff's last visit to a doctor for treatment in connection with the accident was December 27, 1982.
Plaintiff is aware of the slight possibility that permanent damage to his vital organs may have resulted from the accident, which *382 could show up later. He is also aware of the increased risk of skin cancer to the skin graft area on his left foot and that there is a slim possibility of cataracts and arthritic problems evidencing themselves in the future. No doubt these uncertainties caused plaintiff anxiety and worry. However, plaintiff did not take medication or seek treatment for anxiety.
Applying the foregoing legal principles after our careful review of the record, we conclude that the trier of fact clearly abused its discretion in making its general damage award. The award is unreasonable and excessive since the evidence, as articulated hereinabove in a light most favorable to Mr. Horton, does not realistically support a finding of any permanent injury, disability, extreme pain and suffering, or severe mental anguish.
Bearing in mind that we cannot substitute our judgment as to what we consider to be an appropriate award on the basis of the evidence, but can only lower the excessive award to the highest point which is reasonably within the discretion accorded the trier of fact, we find the highest reasonable amount which could be awarded as general damages in this case to be $35,000. This amount does not include an award of $1,500 for future medical expenses, to pay for the corrective operation on plaintiff's left foot, which amount we award and add to the special damages previously granted.
Accordingly, and for the foregoing reasons the judgment appealed from is amended as follows:
IT IS ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of Walter G. Horton and against Valley Electric Membership Corporation in the amount of $35,000 for past, present and future pain and suffering and emotional distress, which sum shall bear legal interest from date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is rendered in favor of Walter G. Horton and against Valley Electric Membership Corporation, in the amount of $4,778 for past and future medical expenses, together with legal interest from date of judicial demand until paid. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendant shall pay all costs of court which shall include all expert witness fees.
As amended, the judgment is affirmed with costs of this appeal to be divided equally between appellee and appellant.
AMENDED AND AS AMENDED, AFFIRMED.
NOTES
[1] Plaintiff's brief claims that the minimum height for the line in question under the code is eighteen feet. However, for purposes of this opinion, we accept the fifteen foot requirement to VEMCO's answer to plaintiff's interrogatories. The code, itself, was not introduced into evidence.
[2] While compliance or noncompliance with the Code's standards does not, per se, relieve the owner of electrical transmission lines of negligence nor act as a presumption of negligence, in Burley v. Louisiana Power & Light Co., 319 So.2d 334 (La.1975), the court observed that the code is entitled to such probative weight as it warrants in the judgment of the court. Although the National Electric Safety Code has not been adopted as a safety standard by any law or ordinance applicable here, it is a publication which reasonable minds would agree to be trustworthy and is therefore of probative value in determining whether there was a breach of duty on the part of VEMCO toward the plaintiff. Burley, supra; Dyson v. Gulf Modular Corp., 338 So.2d 1385 (La.1976); Williams v. City of New Orleans, 433 So.2d 1129 (La.App. 4th Cir.1983).