594 So.2d 1119 (1992)
Edwinna FANNIN, Wife of the deceased, Elmer Allan Duncan, and Marion Natkowski
v.
LOUISIANA POWER & LIGHT COMPANY and the State of Louisiana, Department of Transportation and Development.
No. 91-CA-559.
Court of Appeal of Louisiana, Fifth Circuit.
February 18, 1992.
Rehearing Denied March 17, 1992.
*1120 Stephen R. Murray, Patricia R. Murray, Charles R. Ward, Jr., Murray Law Firm, New Orleans, Elliot E. Brown, Metairie, Sheldon G. Fernandez, Harvey, for plaintiffs-appellees-cross-appellants.
George F. Riess, Edward T. Meyer, Monroe & Lemann, New Orleans, for defendant-appellant Louisiana Power & Light Co.
William R. Guste, Jr., Atty. Gen., Ivor A. Trapolin, Miles G. Trapolin, Trapolin Law Firm, New Orleans, Sp. Asst. Atty. Gen. in behalf of defendant-appellant, the State of La., Dept. of Transp. and Development.
H.F. Foster, III, John E. McAuliffe, Jr., Bienvenu, Foster, Ryan & O'Bannon, New Orleans, for defendants-appellants Earl Buras and Boh Bros. Const. Co., Inc.
*1121 Before KLIEBERT, C.J., and GRISBAUM and WICKER, JJ.
KLIEBERT, Chief Judge.
This tort action comes before us following a trial court judgment in favor of plaintiffs, Edwinna Fannin, wife of Elmer Allan Duncan and Marion Natkowski and against defendants Louisiana Power and Light (LP & L) and the State of Louisiana, through the Department of Transportation and Development (DOTD). Judgment was also rendered over/against third party defendant Boh Brothers Construction Company, Inc.[1] (Boh Bros.) in accordance with the third party demands asserted by LP & L and DOTD. For the following reasons we reverse in part, amend in part and as amended, affirm.
Mr. Duncan and Mr. Natkowski, employees of Boh Bros., were electrocuted on March 16, 1982 while in the course and scope of their employment, and during construction of the Westbank Expressway bridge over the Harvey Canal. The electrical shock killed Duncan and injured Natkowski.
One of the job duties of Duncan and Natkowski was to assist in moving a "spider basket" and scaffolding from one bridge pier to the next so the touch-up crew could complete work on the piers. The work called for attaching a spider basket to each end of a scaffold. Each spider basket was then attached to the top of the bridge by a cable and the workmen would raise and lower the device along each pier by use of an air-driven winch. Upon completion of each pier, the device was disconnected and each spider basket and the scaffold were walked separately to the next pier, approximately 200 feet away.
The accident occurred just after lunch. Duncan and another man were positioned on the bridge to carry the cable to the adjacent pier. At this stage of the construction the bridge railing was not completed, rather it consisted only of bare reinforcement rods which formed the shape of the railing. Four men, Earl Buras, Jr. (a carpenter foreman), Gerald Barette (painting crew foreman), Natkowski and Alvin Jones (a cement finishing crew foreman), carried the spider basket from one pier to the next. The six men were walking the length of the bridge when the cable contacted an uninsulated high power line running under and perpendicular to the bridge. The resulting shock killed Duncan and injured three of the four men on the ground. Only Jones, who was wearing two pairs of gloves, was not injured.
The trial court found LP & L and DOTD negligent because they failed to either remove or insulate the uninsulated high power line crossing the bridge construction site. The court found both defendants knew or should have known of the danger posed by the uninsulated high power line crossing the construction site and that they had a duty to take steps to protect the construction workers. Neither defendant took any of a number of possible actions to protect the workers and were found negligent. The court further found the acts of Boh Bros. and its supervisory employees were beyond gross and wanton negligence sufficient to place it into the category of an intentional tort and cast Boh Bros. in judgment on the third party demands, subject to a credit for the amount of compensation previously paid. Neither plaintiff was found to be negligent. LP & L, DOTD, and Boh Bros. have appealed. Plaintiffs answered the appeal.
Plaintiffs brought suit against LP & L and DOTD alleging these defendants were liable to them for the pain and suffering, wrongful death, and wages lost by Mr. Duncan; the loss of consortium suffered by Mrs. Duncan; and the pain and suffering and wages lost by Mr. Natkowski. Both LP & L and DOTD alleged victim fault. Each also third partied Boh Bros. alleging its intentional acts were the cause of plaintiffs' injuries and thus, if they were cast in judgment, there should be judgment *1122 over/against Boh Bros. in favor of LP & L and DOTD.
The issues before us are: (1) the propriety of the trial court's negligence findings concerning LP & L, DOTD and plaintiffs; (2) whether Boh Bros.'s acts were sufficient to constitute an intentional tort; and (3) the propriety and/or sufficiency of the damages awarded to plaintiffs.

NEGLIGENCE OF LP & L AND DOTD
The plaintiffs alleged LP & L and DOTD were negligent in failing to take the necessary steps required to protect construction workers from potential electrical shock caused by contact with an uninsulated high power line crossing the construction site. The Louisiana Supreme Court and this Court have recently set forth the law with regard to electrical accidents in Dobson v. Louisiana Power & Light Co., 567 So.2d 569 (La.1990); Levi v. S.W. La. Elec. Membership Co-Op., 542 So.2d 1081 (La.1989) and Green v. Louisiana Power & Light Co., 590 So.2d 786 (La.App.1991), as follows:
Since there are occasions when high voltage electricity will escape from an uninsulated transmission line, and since, if it does, it becomes a menace to those about the point of its escape, the power company's duty, as in other similar situations, to provide against resulting injuries is a function of three variables (1) the possibility that the electricity will escape; (2) the gravity of the resulting injury, if it does; (3) the burden of taking adequate precautions that would avert the mishap. When the product of the possibility of escape multiplied times the gravity of the harm, if it happens, exceeds the burden of precautions, the failure to take those precautions is negligence.
The cost of prevention is what [is] meant by the burden of taking precautions against the accident. It may be the cost of installing safety equipment or otherwise making the activity safer, or the benefit foregone by curtailing or eliminating the activity. Levi, supra, at 1087.
The crucial questions are (a) whether the power company was required to recognize that its conduct involved a risk of causing physical injury or loss to another in the manner of that sustained by the plaintiff, and, if so, (b) whether the possibility of such injury or loss constituted an unreasonable risk of harm. These issues are decisive under either a duty risk or a traditional negligence approach. The legal duty under one approach and the standard of conduct under the other impose the same obligation, viz., when the power company realizes or should realize that the transmission of electricity through its line presents an unreasonable risk of causing physical harm to another, it is under a duty to exercise reasonable care to prevent the risk from taking effect. It is undisputed that the escape of electricity from the power company's line was a cause in fact of the plaintiff's injuries. If the risk which took effect as plaintiff's injuries was an unreasonable one, and the power company failed to comply with a duty or standard of care requiring it to take precautions against that danger, the risk was within the scope of the defendant's duty and defendant's substandard conduct was a legal cause of the injuries.
A power company is required to recognize that its conduct involves a risk of causing harm to another if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. The standard becomes, in other words, that of a reasonable person with such superior attributes.
It is well recognized that those who engage in certain activities or come into certain relationships with people or things are under a peculiar obligation to acquire knowledge and experience about that activity, person or thing. A carrier owes to its passengers the duty of discovering all detectable defects. Manufacturers must learn of dangers that lurk in their products. Traditionally, professionals as well as manufacturers *1123 must keep reasonably abreast of current advances in their fields.
By the same token, a company which maintains and employs high power lines is required to exercise the utmost care to reduce hazards to life as far as practicable. Pursuant to this duty, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects. Consequently, a company will be considered to have constructive knowledge of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its duties. Levi, supra, at 1083-85 (citations omitted).
Any person is required by law to recognize that his conduct involves a risk of causing harm to himself if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. A reasonable person who has an ordinary amount of exposure to the facts of modern life in America should be treated as though he knows that any electrical line could be dangerous. Dobson, supra, at 573 (citations omitted).
As hereinafter discussed, the evidence produced at trial supported the trial court's finding that LP & L and DOTD were negligent and that this negligence was a cause-in-fact of plaintiffs' injuries and damages. Because we find no manifest error in that ruling, we must affirm. Canter v. Koehring, 283 So.2d 716 (La. 1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Rosell v. Esco, 549 So.2d 840 (La.1989).
LP & L and DOTD were involved with all aspects of this construction project since the late 1970's. The project called for building an elevated expressway from the Greater New Orleans Mississippi River Bridge to points west of the Harvey Canal.
Peters Road and Destrehan Avenue are streets running parallel to the Harvey CanalPeters Road on the east bank and Destrehan Avenue on the west bank of the canal. Prior to the start of this project, an uninsulated high power line ran along each side of the Harvey Canal. In 1979 a crane struck the Peters Road line near pier 178, the same pier where the accident before us occurred, causing a power outage from the Westbank Expressway to Fourth Street. In 1980, both the Peters Road and Destrehan Avenue lines were alternately removed and reinstalled to allow for the raising of girders for the bridge construction. Upon reinstallation, the Destrehan Avenue line was insulated; the Peters Road line was not. The evidence established that the Peters Road line could be removed at a cost of $5,500.00.
LP & L clearly knew or should have known that there was a high probability that electricity would escape the uninsulated Peters Road line through the continued presence of the uninsulated Peters Road power line running perpendicular to and through the bridge's construction site. The construction of a bridge over the uninsulated power line, with the myriad of electricity conducting materials being used, clearly places this variable at a high figure.
All witnesses testified as to their understanding of the potential harm to be done by coming in contact with an electrical current. Death from electrocution is not unlikely. Thus, the gravity of injury resulting from the escape of electricity is also high.
Finally, the burden of taking adequate precautions, i.e., the cost of prevention, was low. Prior to the accident herein, a price to remove the Peters Road line was quoted at $5,500.00. When the product of the possibility of escape multiplied times the gravity of the harm, if it happens, exceeds the burden of precautions, the failure to take those precautions is negligence. Clearly, this is the situation in the case before us.
LP & L clearly knew or should have known that the continued presence of the uninsulated Peters Road power line running perpendicular to and through the bridge's construction site presented an unreasonable risk of harm to the construction *1124 workers on that site. They had a duty to protect the construction workers from this harm. LP & L's failure to take any steps to protect the workers constituted a breach of that duty and was a legal cause of the injuries. See Hebert v. Gulf States Utilities Co., 426 So.2d 111 (La.1983); Dobson, supra; Levi, supra; Green, supra.
Likewise, we affirm the ruling that DOTD was negligent and liable for plaintiff's damages. The essential elements of negligence under C.C. Article 2315 are (1) the defendant was a cause-in-fact of the plaintiffs' harm; (2) a duty existed on the part of the defendant, which duty was imposed to protect against the particular harm involved; (3) a violation of the duty owed; and (4) actual damages. Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Shafouk Nor El Din Hamza v. Bourgeois, 493 So.2d 112 (5th Cir.1986).
Mr. George Keller testified on behalf of DOTD. Mr. Keller's duties as district utility representative for DOTD was to review the project plans prior to construction to determine what utilities would be in conflict with the construction and make recommendations to DOTD on how to resolve any conflicts, such as removal or insulation of power lines. DOTD had the ability to require LP & L to relocate or insulate the line. He testified that although DOTD's consulting firm, Howard, Needles, Tammen & Bergenoff, specifically recommended relocating the Peters Road line in 1977, he recommended to DOTD supervisors that the line not be changed because the line was not in direct conflict with the construction, i.e., a pier or other structure was not planned to be constructed directly through the position of the line. Thus, DOTD did not require relocation or insulation of the Peters Road line.
Although the Peters Road line surpassed the national safety standards for clearances surrounding the line, DOTD had a duty to the construction workers on their project to provide a workplace free from unreasonable risks of harm. An uninsulated power line crossing a bridge construction site clearly has a potential to cause serious injury or death. DOTD had the power and authority to require that the power line be rerouted or insulated. Their failure to take any steps to reroute or insulate the power line is clearly a breach of duty owed to the construction workers. Accordingly, the trial court's finding of negligence on the part of DOTD is affirmed.

LIABILITY OF BOH BROS.
LP & L and DOTD third partied Boh Bros. alleging intentional acts on the part of Boh Bros. were a cause-in-fact of the plaintiffs' injuries. LSA-R.S. 23:1032 provides in pertinent part:
§ 1032. Exclusiveness of rights and remedies; employer's liability to prosecution under other laws
A. (1)(a) The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents, or relations, against his employer, or any principal or any officer, director, stockholder, partner, or employee of such employer or principal, for said injury, or compensable sickness or disease.
* * * * * *
B. Nothing in this Chapter shall affect the liability of the employer, or any officer, director, stockholder, partner, or employee of such employer or principal to a fine or penalty under any other statute or the liability, civil or criminal, resulting from an intentional act.
* * * * * *
In order for an employee to recover from his employer in tort, the employee must prove an intentional act on the part of the employer was a cause of his injuries. The leading case of Bazley v. Tortorich, 397 So.2d 475 (La.1981) established that an intentional act within the contemplation of the statute is an intentional tort. Bazley further established the test for an intentional tort is either the employer consciously *1125 desired the consequences of his act, or he knew the result was certain or substantially certain to follow from his conduct. Maddie v. Plastic Supply & Fabrication, Inc., 434 So.2d 158 (5th Cir.1983). In Maddie, this Court went on to state if a reasonable person must have perceived that the act was substantially certain to cause injurious consequences, then the tortfeasor will be treated by the law as if he intended those consequences, whether he in fact intended them or not. Maddie, supra at 160.
Here, three Boh Bros. supervisors carried the basket along with Mr. Natkowski across Peters Road. All had been on the construction site for many months and were fully aware of the thin, uninsulated power line crossing overhead. The trial court found Jones called to the attention of Buras the possibility of contact with the power line. Buras advised it would be no problem and directed the movement of the spider cage through the uninsulated power line. Another Boh Bros. employee performed traffic control duties on Peters Road as the others carried the spider basket from one pier to the next. From the top of the bridge Mr. Duncan carried the metal cable attached to the spider basket over the same path, occasionally looking over the unfinished railing to maintain pace.
The trial court held "the actions of Boh Bros. and Earl Buras, its employee, were beyond gross and wanton negligence, sufficient to place it into the category of an intentional tort." While we agree their actions constituted gross and wanton negligence, this does not convert their actions to an intentional tort. Gallant v. Transcontinental Drilling Co., 471 So.2d 858 (2nd Cir.1985); Davis v. Southern Louisiana Insulations, 539 So.2d 922 (4th Cir.1989); Hood v. South Louisiana Medical Center, 517 So.2d 469 (1st Cir.1987). The proper test is that enunciated by Bazley, supra, i.e., the employer either consciously desired the consequences of his act or knew the result was certain or substantially certain to follow from his conduct.
There is no evidence of record to show Boh Bros. or its supervisory employees either consciously desired the resulting consequence of moving the spider basket or that they knew the results were certain or substantially certain to follow from their conduct. The fact that the employees walked the cable into the uninsulated high voltage power line is not in dispute. However, there is no evidence that the employees intended to contact the power line. All were aware of the danger posed by contacting a high voltage power line with a cable that conducts electricity. All but Jones testified they did not see the power line. All testified they would not have knowingly walked the cable into the power line. Persons are presumed to act in such a manner as will not necessarily expose themselves to physical harm. Babin v. Edwards, 456 So.2d 659 (1st Cir.1984) writ denied 460 So.2d 604 (La.1984). Accordingly, we find the trial court erred in holding the negligent acts of the Boh Bros. employees constituted an intentional tort under the ruling of Bazley v. Tortorich, supra. Boh Bros.'s liability is limited to worker's compensation. Therefore, the judgment holding them liable for an intentional tort is reversed.
It was stipulated at trial that Boh Bros. paid to or on behalf of Mr. Duncan or to his widow $3,559.95 in medical expenses and a total of $64,473.38 in worker's compensation payments and that Mrs. Duncan continues to be paid $142.28 per week.
Boh Bros. had paid to or on behalf of Mr. Natkowski a total of $1,464.00 in medical expenses and $549.00 in worker's compensation payments.
All parties further stipulated that in the event judgment was rendered in favor of Duncan, Boh Bros. is entitled to reimbursement of $68,033.33 in compensation benefits and medical expenses paid as well as all additional compensation benefits, $142.28 per week, paid to Mrs. Duncan through the final judgment herein.
All parties further stipulated that in the event judgment was rendered in favor of Natkowski, Boh Bros. is entitled to reimbursement of compensation benefits and medical expenses paid in the amount of *1126 $2,013.00. All reimbursement to Boh Bros. was stipulated to be paid by preference and priority out of any judgment rendered in favor of plaintiffs.
Because we find plaintiffs' recovery against Boh Bros. is limited to worker's compensation and that LP & L and DOTD are liable to plaintiff in tort, Boh Bros. is entitled to reimbursement of the stipulated benefits and medical expenses paid to plaintiffs.[2]

PLAINTIFFS' NEGLIGENCE
The trial court found neither Mr. Duncan nor Mr. Natkowski was negligent in that they were following the orders of their supervisors. Natkowski was carrying the spider basket with three supervisory personnel. One, Gerald Barette, was Duncan's and Natkowski's immediate supervisor. Barette testified as foreman he was in charge of safety and directed the men in moving the spider basket across Peters Road. Barette stated he did not see the electric line or he would not have directed the crew to move the spider basket and cable into the line. He further testified that, for safety reasons, Duncan was instructed not to look over the side of the bridge while carrying the heavy cable (except occasionally to receive signals from the crew below) for fear he could be pulled off the bridge.
Accordingly, we find no manifest error in the trial court ruling that plaintiffs were not at fault in causing the accident and their resulting injuries.

QUANTUM
The trial court made the following awards:

In favor of Edwinna Fannin, wife of Elmer A. Duncan:
 Past lost wages $133,009.00
 Future loss of earning capacity 449,023.00
 Loss of love and affection 300,000.00
In favor of Marion Natkowski:
 Past lost wages $ 7,370.00
 Loss of earning capacity 68,784.00
 Pain and suffering/mental anguish 45,000.00

In Gagnet v. Zummo, 487 So.2d 721, 723 (5th Cir.1986), this Court stated:
"In determining whether an award of damages is inadequate or excessive we must first inquire whether [trier of fact's] award for particular injuries and their effect upon the injured person was a clear abuse of the trier of fact's `much discretion.' On appellate review it is only after an articulated analysis of the facts discloses an abuse of discretion that an award may for stated reasons be considered either excessive or insufficient. Only after making a determination *1127 of abuse can an appellate court disturb the award and then only to the extent of lowering it or raising it to the highest (or lowest) point which is reasonably within the discretion afforded that judge or jury. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5th Cir. 1984)."
See also Demarest v. Progressive American Ins., 552 So.2d 1329, 1333-34 (5th Cir. 1989).

DAMAGES AWARDED TO EDWINNA FANNIN, WIFE OF ELMER A. DUNCAN
On appeal, defendants contend the award of $300,000.00 to Mrs. Duncan for loss of love and affection resulting from the death of her husband is excessive. Mrs. Duncan contends the trial court erred in failing to award damages to Mr. Duncan for the pain and suffering he experienced prior to his death. No other contest of the award is made by any party.
In making the award for loss of consortium, the trial court stated ".... we have a modern day middle class `Romeo and Juliette' scenario, i.e., a true love affair by children of a tender age which reached fruition when at a proper age they were married."
Allan and Edwinna Duncan began their courtship while in their teens. They attended church activities together and fell in love. They continued to see each other after Edwinna left for school in Mississippi; however, their love for each other would not die. Edwinna returned to Louisiana to continue the courtship. Allan and Edwinna were married on October 23, 1981.
After the marriage, Allan and Edwinna were inseparable. They spent almost all their free time together at church functions, hunting or simply spending their time alone with each other. They were married approximately five months when Allan was killed. Allan's death devastated Edwinna and left her lost and in a daze. Although she has not remarried, she began living with another man and had two children who were four years old and seventeen months old at the time of trial.
On the facts presented to the trial court, we cannot say the award of $300,000 to Edwinna Duncan for the loss of love and affection due to the death of her husband was an abuse of the trial court's much discretion. Accordingly, that part of the judgment is affirmed.
Mrs. Duncan contends the trial court erred in failing to award damages for Allan Duncan's conscious pain and suffering from the time of electrocution to his death, approximately 60 seconds later.
Dr. Paul McGarry, a pathologist for the Orleans Parish Coroner's office was qualified as an expert pathologist. He performed the autopsy on Duncan on March 17, 1982 and testified as to the effects of electrocution on the body.
Dr. McGarry testified the electrical charge entered through Duncan's hand and exited through his foot. He had exit wounds, characterized by charring of the skin, on his left heel and on the outside of his right forearm. Additionally, his body had abrasions from the cheek down the shoulder and arm to his hand on the right side of his body and on his left elbow. The abrasions were the result of his body being thrown firmly against a rough surface and scraping the skin off.
In explaining the effects of an electrocution on a person, Dr. McGarry testified Duncan probably felt a violent contraction of his muscles throughout his body immediately following the shock. For a brief period Duncan was able to feel this and, to some degree, understand what was happening to him. Although electricity passes through the body instantaneously, Dr. McGarry testified Duncan's death occurred in more than a matter of seconds and that within a minute he was probably unconscious and in shock.
The trial court did not award Duncan damages for pain and suffering. On the facts before the Court we cannot say there was a clear abuse of the fact finder's much discretion. Accordingly, we affirm the trial *1128 court judgment denying damages to Duncan for his pain and suffering.

DAMAGES AWARDED TO MARION NATKOWSKI
On appeal, defendants contend the award of $45,000 to Natkowski for pain and suffering is excessive and should be reduced. Additionally, they contend the past and future earnings awarded should be reduced to zero since Natkowski refused to return to work although released by his treating physician shortly after the accident. Natkowski contends the trial court erred in awarding only $7,370.00 in past lost wages.
Natkowski was one of the workers carrying the spider basket when it contacted the power line. The resulting shock knocked him to the ground. He suffered exit wounds to his left foot, headaches, back aches, leg pain and nervousness as well as a general ache to his entire body. He sometimes has difficulty walking and continues to suffer from nervousness, headaches and backaches.
Following the accident, Natkowski was hospitalized and suffered second degree burns to his feet from the electrocution. He was treated by Dr. Alberto Arrillaga in the hospital and to the end of March, 1982. The medical report indicated Natkowski should have been able to resume regular work in five to seven days.
Because of continued headaches and nervousness, Natkowski continued with sporadic medical treatment. He was seen by Dr. Carl Culicchia for four months and later by Dr. Melville Reehlmann. Dr. Reehlmann, admitted as an expert in orthopaedic surgery, first saw Natkowski in March 1983. Natkowski was treated by Dr. Reehlman through April of 1983, and again when he returned in September of 1985. He continued with the same complaints with no evidence of an intervening accident. Dr. Reehlmann diagnosed Natkowski as suffering from facet syndrome which exhibits symptoms of pain similar to that of a disc herniation. Dr. Reehlmann opined the injury was caused by the electrocution of March 16, 1982 and that Natkowski may never be free from pain.
On the facts before the trial court, we cannot say the award of $45,000.00 for Natkowski's pain and suffering and mental anguish was an abuse of the trial court's discretion. Accordingly, the award is affirmed.
Defendants further contend the award of $7,370.00 to Natkowski in past lost wages was error because it was not Natkowski's injuries that prevented his return to work but his own desire not to work. The accident herein occurred on March 16, 1982 and his original treating physician, Dr. Alberto Arrillaga released Natkowski to return to work five to seven days post accident. Despite this release, Natkowski did not return to work until 1985 because he continued to have pain and nervousness. Then, on June 20, 1985, he suffered a heart attack. He did not return to work until approximately two years later. However, Natkowski continued in pain and testified he was not able to work due to his condition. Dr. Reehlmann testified he felt Natkowski was sincere about his complaints of pain.
Kenneth Boudreaux, admitted as an expert economist on behalf of LP & L, estimated Natkowski lost wages of $7,371.00 per year for a total from the date of accident to trial of between $35,037 and $68,784. The trial court award of $7,370 is thus clearly wrong. We find the lowest amount the trial court could reasonably award to Natkowski for past lost wages was $35,037.00. The judgment is amended accordingly.
For the foregoing reasons, the trial court judgment holding Boh Bros. liable in tort is reversed. Plaintiffs' exclusive remedy against Boh Bros. is limited to worker's compensation. Further, Boh Bros. is entitled to reimbursement of compensation benefits and medical expenses paid to or on behalf of Duncan in the total amount of $68,033.33 as well as all additional compensation benefits paid to Mrs. Duncan through final judgment herein. Reimbursement is owed on behalf of Natkowski in the total amount of $2,013.00. All reimbursement *1129 is to be paid by preference and priority out of the judgment rendered herein.
Further, the award to Mr. Natkowski for past lost wages is amended and fixed at $35,037.00. In all other respects, the trial court judgment is affirmed.
REVERSED IN PART, AMENDED IN PART, AND AS AMENDED, AFFIRMED.
NOTES
[1] A Boh Bros. supervisor, Earl Buras, Jr., was also a named third party defendant. Other defendants were dismissed prior to trial.
[2] LSA-R.S. 23:1101 provides:

"When an injury or compensable sickness or disease for which compensation is payable under this Chapter has occurred under circumstances creating in some person (in this Section referred to as third person) other than those persons against whom the said employee's rights and remedies are limited in Section 1032 of this Chapter, a legal liability to pay damages in respect thereto, the aforesaid employee or his dependents may claim compensation under this Chapter and the payment or award of compensation hereunder shall not affect the claim or right of action of the said employee or his dependents, relations, or personal representatives against such third person, nor be regarded as establishing a measure of damages for the claim; and such employee or his dependents, relations, or personal representatives may obtain damages from or proceed at law against such third person to recover damages for the injury, or compensable sickness or disease.
Any person having paid or having become obligated to pay compensation under the provisions of this Chapter may bring suit against such third person to recover any amount which he has paid or become obligated to pay as compensation to such employee or his dependents."